DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
Ryan S. Dustin, Esq. (ISB No. 8683)
rdustin@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Rd., Suite B
Idaho Falls, ID 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CAMILLE VENEMON,<br><br>                    Plaintiff,<br><br>v.<br><br>IDAHO STATE UNIVERSITY FEDERAL CREDIT UNION,<br><br>                    Defendant. | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $400.00 |

Plaintiff, Camille Venemon, by and through her counsel of record, Casperson Ulrich Dustin PLLC, and as a cause of action against Idaho State University Federal Credit Union, complains and alleges as follows:

**JURISDICTION AND VENUE**

1. This is an action brought under the Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000, *et seq.*; the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*.; and the common law of the State of Idaho.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1334, and 1367.

3. Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose, in this judicial

1 –   COMPLAINT AND DEMAND FOR JURY TRIAL

district; and venue also properly lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

## PARTIES

4. Plaintiff Camille Venemon ("Venemon") is a female citizen and resident of the United States of America, who, at all times pertinent to this matter, resided in Bannock County, Idaho.

5. Defendant Idaho State University Federal Credit Union ("ISUFCU") is a credit union with its principal place of business in Bannock County, Idaho.

6. At all times relevant to this Complaint, ISUFCU regularly employed fifteen or more persons whose services were performed in the State of Idaho and was engaged in an industry affecting commerce. Consequently, ISUFCU's conduct is properly regulated by Idaho Code § 67-5901, *et seq.*; and 42 U.S.C. § 2000e, *et seq.*

## FACTS COMMON TO ALL COUNTS

7. Venemon realleges and incorporates by reference paragraphs 1 through 6 as though fully set forth herein.

8. Venemon began working at ISUFCU in April 2014 as a Member Service Representative. While Venemon worked in that role, her male branch manager often made sexual comments to Venemon.

9. In the spring of 2017, Venemon applied for an executive assistant position at ISUFCU headquarters. When her branch manager learned of her application, he said to Venemon, "I wonder what questions they will ask you in the interview? I bet they will ask you have many STDs models have." Venemon's branch manager knew she previously worked as a model.

10. Venemon got the job, and became CEO Rob Taylor's ("Taylor") executive assistant. She began working in that position in May 2017.

11. At the time, Venemon was 33 years old, and Taylor was 53 years old.

12. Venemon was a salaried employee, and was told her schedule was flexible, including what time she arrived for work.

13. During the course of Venemon working as Taylor's executive assistant, Taylor slowly started to try to spend time with her outside of work.

14. Venemon and Taylor both happened to share an interest in road biking. They both attended a regular Thursday night ride in Pocatello. Venemon began to trust Taylor as a mentor and friend.

15. Taylor began making comments that made Venemon uncomfortable. Taylor commented on Venemon's legs several times, telling her that she had nice legs and asking her if she always had such muscular calves.

16. Taylor found out Venemon planned to attend the Century Ride event in Idaho Falls, and insisted that Venemon ride up with him from Pocatello to Idaho Falls for the race. Venemon was very uncomfortable during the ride, and only accepted the ride out of obligation.

17. One day when Venemon was sitting at her desk, and wearing black pants which were faux leather on the front and cloth on the back, Taylor asked Venemon if her pants were real leather. Venemon said they were not. However, Taylor immediately reached down, placed his hand on her thigh, and moved his hand back and forth to feel her pants, saying, "They feel like real leather to me."

18. In or around January 2018, Venemon began to have problems in her marriage, and Taylor became even more friendly and unprofessional toward Venemon. He would call Venemon into his office, have her close the door and talk about his personal life and illicit drugs.

19. Around that same time, Taylor approached Venemon at work and asked her if she wanted to go with him to see the construction progress on ISUFCU's new headquarters. Venemon

agreed to go, again, out of obligation, and Taylor took her in his personal truck to the location. On the way, he took out a vape pen and took multiple hits while he was driving. He offered Venemon some but she said no.

20. When they arrived at the construction site, they got out and walked around the building. When they got back in the truck, Taylor took out the vape pen again and began smoking while he drove. He kept insisting that Venemon take some hits. She repeatedly refused.

21. Taylor then asked Venemon to tell him where she lived so he could drive to her house while she was with him because he wanted to see where she lived. Venemon was uncomfortable and wished she could just go back to work. However, because she felt she had no other option because Taylor was her boss and her transportation back to work, she told him where she lived. Taylor drove to her house.

22. Taylor asked Venemon if her husband was home because there were cars in the driveway. Venemon told Taylor she was not sure, even though she knew her husband was at work, because she was afraid Taylor would want to go inside her house.

23. Taylor then said they should go to the store and go shopping. Venemon said she really needed to get back to work. Taylor drove them back to the office.

24. When Taylor and Venemon returned to the office, COO Doug Chambers ("Chambers") was in the parking lot. Chambers asked where they had been, and Taylor told them they had gone to see the construction progress at the new headquarters. Chambers appeared to recognize something was amiss based upon his body language and facial expression.

25. After Venemon filed for divorce in March 2018, Taylor called her into his office and told her that he was not happy in his marriage, that he did not have children at home any longer, and that he often fantasized about riding off on his motorcycle.

26. Venemon took the following week off of work to pack up her belongings and move out of the home she had shared with her ex-husband. On one of the days she was home packing, Taylor called her cell phone multiple times. Venemon did not answer. Then she saw him pull into her driveway. Taylor called her again. Again she did not answer, and waited until he left before she returned his call.

27. When she called Taylor, he told her that he had left work that afternoon to come see her and asked if he could come to her house. Venemon felt she had no choice because he was her boss, and reluctantly agreed.

28. Taylor entered Venemon's house, and told her not to tell anyone he had gone to her house, especially Chambers. Taylor sat on her couch and asked her if she wanted to sit with him and talk. Venemon chose to stand and continue packing. She was very uncomfortable being alone with him in her house.

29. After Venemon moved out of her old house and into a new house in the spring of 2018, Taylor gave her a very generous raise. He told her he was pleased with her work as executive assistant, and understood she was single now and had just bought her first home.

30. Taylor started referring to Venemon as "Donna." Though Venemon was unfamiliar with the show at the time, "Donna" is a character on the TV show "Suits." Taylor explained to Venemon that Donna knows everything, is the best assistant, and is very attractive.

31. Upon further research, the relationship between Donna and her boss on Suits centered around sexual tension, and they slept together at one point. Their relationship on the show was a "will they/won't they" situation, and ultimately, the two got married on the show (though the marriage on the show did not occur until September 2019).

32. Taylor set up his office in the new ISUFCU headquarters so the interior wall was floor to ceiling windows. He put Venemon's desk right in front of the window, and would often

stare at her. His actions were so obvious that Chambers and CFO Cory Omanson would go into Taylor's office when he was gone, sit at his desk, and yell out the door to Venemon, "Camille, can you feel me staring at you?" and then proceed to laugh. They also made comments that Taylor always had his eyes on Venemon.

33. Venemon was never interested in Taylor in any kind of romantic or sexual way, nor did she ever give him any reason to think she was. However, it was clear based upon Taylor's actions that he was hoping their work relationship would turn into something more. It did not, because Venemon would not allow it to. She was uncomfortable around him, and he seemed to be starting to see she was uncomfortable around him as well. Around that time (approximately April 2018), there were numerous news reports about sexual harassment, and men in powerful roles exploiting their positions over women for their own sexual benefit.

34. While Venemon worked for Taylor, she went out with Chambers and his wife socially on several occasions. On at least two occasions, Chambers called Venemon into his office after one of those social events, and told Venemon not to mention to Taylor that they had gone out together, because Taylor would be jealous.

35. Chambers also mentioned to Venemon that he (Chambers) and Venemon speaking together would make Taylor jealous and it would be bad for both Venemon and Chambers if Taylor were to find out. When Venemon had to meet with Chambers for work-related reasons, and Taylor happened to walk by and see them meeting, Taylor would come in and ask what Chambers and Venemon were doing, even though he knew it was for work-related reasons.

36. Venemon did everything she could to make it clear she was not interested in a relationship with Taylor without offending him as her boss. After it became clear to Taylor that a sexual/romantic relationship with Venemon was not going to happen, he began treating Venemon differently. Further, his behavior and attitude toward Venemon changed

significantly when the Credit Union Prodigy Board, of which Taylor was a member, had to fire the Prodigy CEO for sexual harassment.

37. Taylor changed Venemon from a salaried employee with flexible hours to an hourly employee. He became obsessed with when Venemon clocked in and would rarely speak to her. He stopped including Venemon in birthday lunches for the executives, though she had been invited before.

38. Taylor also told Venemon that dresses she had been wearing the entire time she had been working for him were too short and not to wear them anymore (the dresses were no more than a couple of inches above her knee).

39. Taylor began telling Venemon that she had to clock in at 8:30 am every morning, but also told her that he did not care if she clocked in 10 to 15 minutes after 8:30 am. Despite this, he wrote her up for being late though she was within the window he said was acceptable.

40. In September 2018, ISUFCU had their annual board meeting in Jackson, Wyoming. As Venemon had done previously, she organized the entire meeting, calendered events and dealt with logistics. As had always been the case, all attendees, including Venemon, were permitted to bring their significant others.

41. Venemon planned to bring her new boyfriend. While she was at the office, she mentioned she would be bringing her boyfriend. Taylor suddenly looked very angry, to the point that Chambers commented to Venemon about Taylor's angry reaction to her statement that she would be bringing her boyfriend.

42. Venemon introduced her boyfriend to Taylor at dinner the first night of the meeting. Taylor was very cool toward Venemon and her boyfriend. Venemon and her boyfriend sat at a table with a couple of members of the supervisory committee.

43. While Venemon and the others at her table were chatting at dinner, Taylor came up to Venemon and asked what time she was coming to the meeting room the next morning. She told him she had breakfast service set up in the room from 8 am to 9 am, with the meeting to commence at 9 am. She also stated she would probably be there around 8:30 am. This was the same schedule followed the prior year. Taylor said okay, and walked away.

44. The next morning, Venemon got a text from Chambers around 8:30 am, asking where she was. Venemon told Chambers she would be on her way shortly, and asked if everyone was eating breakfast. Chambers told her they had just started the meeting. Given the conversation Venemon had with Taylor the prior evening, she was shocked, but finished getting ready and was in the conference room by approximately 8:40 am.

45. Taylor acted as if Venemon was late. He then told her that he needed activity bags for the meeting immediately, which Venemon had planned on putting together when she got to breakfast since it would only take about five minutes.

46. At the morning break, Venemon ran to the restroom and then grabbed a couple of coffees from the breakfast buffet area and quickly took them down to her room so her boyfriend could have some coffee. When she came back to the meeting, Taylor told Venemon that just because he was letting everyone else go on a break didn't mean she got a break. He did not speak with Venemon the rest of the day.

47. Later that evening at dinner, numerous people who attended the meeting complimented Venemon on doing a nice job coordinating the events of the meeting. Taylor ignored and avoided her.

48. The next week, Venemon was back in the office in Pocatello, and Taylor was on a business trip in Texas. The atmosphere in the office was strange. No one at the office would speak with her. She texted Taylor to ask him a question about work and he did not respond.

8   –   COMPLAINT AND DEMAND FOR JURY TRIAL

Venemon asked HR Director Lynette Battson ("Battson") if something was wrong, or if she was getting fired because the atmosphere was so strange. Battson responded, "Oh no! Not at all!"

49. On the morning of October 3, 2018, when Venemon got to work, she was told by Battson that Taylor was going to call at 9 am, and she needed to be in Battson's office for the call with Taylor. Venemon did as requested, and when he called in, Taylor fired Venemon over the phone.

50. Taylor told Venemon he had wanted her to be at work at 8:30 am and that she was supposed to be at the annual meeting breakfast at 8:00 am Venemon mentioned that she had specifically talked to him the night prior to the meeting and told him she had planned to be there around 8:30 am, and he had said okay. Taylor then claimed it was a "lack of communication."

51. Taylor told Venemon to give her phone to Battson. Venemon asked if she could get her personal information off her phone, such as family pictures. Venemon was crying at that point. Battson then said, "Give me your phone password."

52. Venemon said she wanted her family pictures before they took the phone. Battson said, "No! Give it to me now!" Through tears, Venemon asked if she could run next door to the Verizon store and have them pull her pictures. Battson then called the police to attempt to force Venemon to give up her phone without retrieving her personal information first. When the police showed up, they were very confused as to why they were called, and Venemon was sobbing at that point.

53. Venemon called her boyfriend to let him know what was going on, to see if he could come help her collect her things because she was so upset. Venemon's boyfriend then called

Taylor to ask if Venemon could get the pictures off her phone. Taylor then called Battson and told her Venemon could get the information off her phone before turning it in.

54. Subsequent to Venemon's termination, Venemon reported the discriminatory and retaliatory conduct that she had suffered to ISUFCU's Board. The Board conducted an investigation which, upon information and belief, resulted in Taylor's termination, but the Board did not reinstate Venemon.

55. Venemon filed for unemployment benefits. In response to Venemon's unemployment claim, several of ISUFCU's executives falsely claimed to have been present for a conversation Venemon had with Taylor for which they were not present in order to keep Venemon from obtaining unemployment benefits.

56. On or about February 7, 2019, Venemon dually filed a Charge of Discrimination with the Idaho Human Rights Commission ("IHRC") and Equal Employment Opportunity Commission ("EEOC").

57. On or about March 9, 2020, Venemon received a finding of "probable cause" on her Charge of Discrimination.

58. On or about July 7, 2020, Venemon received her Notice of Right to Sue.

59. Venemon has exhausted her administrative remedies.

## COUNT ONE
## VIOLATION OF TITLE VII/IHRA
**(Sexual Harassment/Hostile Work Environment/Sex Discrimination)**

60. Venemon realleges and incorporates by reference their respective paragraphs 1 through 59 as though fully set forth herein.

61. Venemon is female and therefore belongs to a protected class under Title VII of the Civil Rights Act and the Idaho Human Rights Act.

62. Venemon was subjected to unwanted comments, staring, attention, including uninvited visits to her home, and touching by Taylor.

63. The conduct of Taylor was unwelcome.

64. Taylor's conduct was based upon Venemon's sex.

65. Taylor's conduct was so severe and pervasive as to alter the terms and conditions of Venemon's employment and create a hostile work environment.

66. Venemon perceived the working environment to be abusive, hostile, and/or offensive.

67. A reasonable woman in Venemon's circumstances would consider the working environment to be abusive, hostile, and/or offensive.

68. Venemon suffered tangible employment actions, including but not limited to being required to tolerate Taylor's actions in order to keep her job, being defacto demoted by Taylor to an hourly pay arrangement instead of salary, being terminated, and having law enforcement called on her by ISUFCU at the time of her termination.

69. Venemon suffered tangible employment actions due to her failure to acquiesce to Taylor's conduct, in particular her failure to engage in a sexual and/or romantic relationship with Taylor.

70. As a direct and proximate result of actions and/or failures to act, Venemon has suffered, and will continue to suffer, emotional distress, consisting of outrage, shock, and humiliation, reasonably occurring and likely to occur based on the sexual harassment and hostile work environment she experienced. Venemon is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to her.

71. ISUFCU's conduct was willful or done with a reckless disregard for Venemon's federally protected rights, for which Venemon is entitled to punitive damages pursuant to 42 U.S.C. § 1981a(a).

## COUNT TWO
## VIOLATION OF TITLE VII/IHRA
**(Retaliation)**

72. Venemon realleges and incorporates by reference their respective paragraphs 1 through 71 as though fully set forth herein.

73. Venemon engaged in a protected activity under Title VII and the Idaho Human Rights Act when, among other things, she reported to the Board that she had been subject to discriminatory and retaliatory actions by Taylor.

74. Venemon was subjected to adverse employment actions as a result of her protected activity, including but not limited to ISUFCU taking action to keep Venemon from obtaining unemployment benefits.

75. ISUFCU discriminated against Venemon and/or retaliated against Venemon due to her engaging in protected activity.

76. As a direct and proximate result of ISUFCU's actions and/or failure to act, Venemon has suffered and will continue to suffer, lost wages, loss of employment opportunities, as well as emotional distress, consisting of outrage, shock, and humiliation, reasonably occurring and likely to occur based upon the retaliatory actions of ISUFCU. Venemon is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to her.

77. ISUFCU's conduct was willful or done with a reckless disregard for Venemon's federally protected rights, for which Venemon is entitled to punitive damages pursuant to 42 U.S.C. § 1981a(a).

## COUNT THREE
## NEGLIGENT SUPERVISION

78. Venemon realleges and incorporates by reference paragraphs 1 though 77 as though fully set forth herein.

79. ISUFCU owed a duty to control Taylor, its CEO, to ensure that its employees were not harmed by his conduct.

80. ISUFCU knew Taylor was engaging in conduct which harmed Venemon.

81. Taylor used his position of power over Venemon to perpetrate sexual harassment, a hostile work environment, and sex discrimination on Venemon.

82. ISUFCU, through its management, knew or should have known that Taylor was committing the acts against Venemon stated above.

83. As a direct and proximate result of ISUFCU's failure to exercise due care to protect Venemon from foreseeable tortious acts of Taylor, Venemon has suffered and will continue to suffer damages, including emotional distress, consisting of outrage, shock, and humiliation, as well as other damages, to be proven at trial.

## COUNT FOUR
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

84. Venemon realleges and incorporates by reference paragraphs 1 though 83 as though fully set forth herein.

85. ISUFCU had a legally recognized duty to ensure its employees were not sexually harassed, subject to a hostile work environment, discriminated against based upon their sex, or subjected to overtly damaging and hostile conduct at work.

86. ISUFCU breached such duty.

87. There is a causal connection between ISUFCU's conduct in failing to ensure its employees were not sexually harassed, subject to a hostile work environment, discriminated against

based upon their sex, or subjected to overtly damaging and hostile conduct at work, and its breach of that duty.

88. Venemon suffered actual loss or damage as a result of ISUFCU's actions.

89. Venemon suffered physical manifestations of emotional distress as a result of ISUFCU's actions and/or failure to act.

90. ISUFCU is liable for the acts of its employees, including Taylor, through the doctrine of *respondeat superior*.

91. As a direct and proximate result of ISUFCU's actions and/or failure to act, Venemon has suffered emotional distress and other damages, to be proven at trial.

## COUNT FIVE
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

92. Venemon realleges and incorporates by reference paragraphs 1 though 91 as though fully set forth herein.

93. ISUFCU acted intentionally or recklessly with regard to its treatment of Venemon during her employment at ISUFCU, including when ISUFCU terminated Venemon's employment and called law enforcement on Venemon.

94. ISUFCU's conduct was extreme and outrageous.

95. There was a casual connection between ISUFCU's conduct and Venemon's emotional distress.

96. Venemon's emotional distress was severe.

97. ISUFCU is responsible for the actions of its employees, including but not limited to Taylor, through the doctrine of *respondeat superior.*

98. As a direct and proximate result of ISUFCU's actions and/or failure to act, Venemon has suffered emotional distress and other damages, to be proven at trial.

## ATTORNEY'S FEES

14  –   COMPLAINT AND DEMAND FOR JURY TRIAL

99. As a further direct and proximate result of ISUFCU's actions and/or failure to act, Venemon has been compelled to retain the services of counsel, and have incurred and will continue to incur costs and attorney's fees. Venemon is therefore entitled to attorney's fees and costs incurred in pursuing this action pursuant to 42 U.S.C. § 1981(b) and 42 U.S.C. § 2000e-5(k).

## DEMAND FOR JURY TRIAL

Venemon demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

Venemon seeks the judgment of the Court against ISUFCU as follows:

1. For general and compensatory damages, and all other statutorily available damages, in an amount to be proven at trial;

2. For any equitable remedies available to her;

3. For liquidated and/or punitive damages;

4. For statutorily available costs and attorney's fees;

5. For prejudgment interest on all amounts claimed; and

6. For such other and further relief as the Court deems just and proper.

DATED this 25th day of September, 2020.     /s/
                                             Amanda E. Ulrich, Esq.
                                             CASPERSON ULRICH DUSTIN PLLC

C:\Users\Dana\Casperson Ulrich Dustin PLLC\Casperson Ulrich Dustin PLLC Team Site - Documents\Active Cases\Venemon, Camille\Pleadings\Complaint.REV 1.wpd:dg